United States Court of Appeals for the 11th Circuit. Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this honorable court. Good afternoon welcome to the 11th Circuit. Today we have on the calendar Sears v. Warden Georgia Diagnostic and Classification Prisons. We will hear first from Ms. Benton. You may proceed when you're ready. May it please the court, Jill Benton for appellate Demarcus Sears. Seven justices of the United States Supreme Court found that trial counsel's investigation into mitigating evidence here was deficient, including those in Lea's words, the state court quote responsibly executed the first Strickland step to conclude that trial counsel's investigation was quote facially deficient. The two other justices, by the way, would have denied certiorari and thereby left the lower court's deficiency finding intact. So this then is a case about prejudice. I'd like to focus our argument today on the prejudice to fatality phase by dealing first with the unconstitutional stable rule then moving to Strickland prejudice before then turning to the coercion that led a jury who had unanimously agreed they were hopelessly deadlocked to nevertheless eventually enter a unanimous death verdict. If time permits then I'd like to speak briefly to the consequences of the state's suppression of material evidence in teaching their star witness. Mr. Sears's case presents the two most powerful mitigating factors that can attach to any capital defendant. Those factors are, according to both this court and the Supreme Court, youth and brain damage. The jury knew that Mr. Sears was just 18 years old but the stable rule kept the fact that his profound brain damage hidden from them. The results of objective, widely accepted scientific testing show that virtually all of Mr. Sears' same-age peers have more ability to suppress their impulses, to problem-solve, to plan a prudent course of action, all of them. This is the type of evidence that, according to Judge N. Carnes, quote profoundly changes the character of the penalty phase proceedings by fundamentally transforming the defendant's sentencing profile. But Mr. Sears' counsel did not have the tools to build this transformative penalty phase case because of the rule of stable versus state. Every court to consider the rule, including this one, has found that the rule is unconstitutional and, as this court held in Wellensee Hall, reversal is possible. Mr. Sears clears that bar. There is no question that had Mr. Sears had the means, his counsel would have hired a competent mental health examiner. That examination would have led to the discovery of his brain damage. Both the Georgia Supreme Court and the District Court below found this fact that it was the stable rule that led counsel to withdraw the motion for the mental health expert. As the District Court noted, Sears, quote, strongly objected to this motion at trial. Both Mr. Gary and Mr. Treadway confirmed in their testimony that, had there been no downside, they would have sought the evaluation because their client seemed disconnected from the dire reality of his situation. As I said, there is no question that that mental health evaluation would have led to the discovery of Mr. Sears' impairments. The tests that Dr. Strickland administered are tests uniform to the discipline of neuropsychology. Any qualified clinician would have realized upon meeting Mr. Sears that a neuropsychological battery was necessary, particularly in light of his history, and that battery of tests reveals in objective terms that he has deficits in areas of executive functioning that are drastic. These bear directly upon his culpability for this crime. No state court has ruled upon the claim as it was presented to the state habeas court. This court's evaluation of the stable claim is therefore de novo. This court can reach and weigh the defendant's any deference as dictated by 2254 and can grant release. In the alternative, should this court disagree and find that the Georgia Supreme Court's decision on direct appeal is nevertheless the relevant decision for the purposes of this court's review, that court's finding is unreasonable as a matter of law because it unreasonably applies awardees the Oregon I'm sorry, and because it is based upon an unreasonable finding of fact that the record reflected no chilling effect or other harm to Mr. Sears. We would ask that this court reach the stable claim and vindicate Mr. Sears' rights to the assistance of an expert under HV Oklahoma, to the tools necessary to build his defense under Griffin v. Illinois, and to reciprocal discovery rules that do not unfairly advantage the prosecution under Wardia v. Oregon. Ms. Benton, this is Jill Pryor. I have a question for you. With regard to the prejudice analysis on the penalty phase mitigation argument, I think it's possible to read the Georgia Supreme Court's decision as ignoring some mitigating evidence that was introduced at state habeas. When the evidence is, quote, the most relevant testimony that likely would have been admissible at trial. But I can't tell what if any evidence the court may have discounted or failed to analyze. Can you identify any such evidence? I cannot. Part of the Georgia Supreme Court's opinion with respect to prejudice talks about some of the evidence being an admissible hearsay, but it doesn't then identify a relevant piece of the mitigation case that would not have made it to the jury because it was hearsay. You know, all of the aspects of Mr. Sears' upbringing, his background, those are all, you know, documented in firsthand accounts from teachers who had experience with how he presented when he came to school, what the fallout from his home life was, from other family members, those close family members and extended family members, and from people who actually lived in the Sears. So I'm not sure what they're excluding from the calculus there, other than to just say that this is another reason that the jury wouldn't have weighed the evidence. So you see it as a weight of the evidence issue? Well, it says that there is some evidence that wouldn't have made it to the jury, but then it doesn't identify what that evidence is, and there isn't any evidence that falls into that category, at least no evidence that would have kept a mitigating fact from making it to the jury. And the U.S. Supreme Court says in its remanding opinion, the fact that some of the evidence was hearsay wouldn't have precluded it from from being weighed by the jury. So it's contrary to the U.S. Supreme Court's decision in this very case to say that any appreciable portion of this mitigating evidence would not have made it to the jury. Let me ask you another question about, you said if our review is not de novo, then there was an unreasonable finding of fact of no chilling effect. What in particular is the fact that you think is unreasonable or was unreasonably found? That there was no chilling effect or other harm to Mr. Wardias' years. So I want to kind of tease out, there's both the the 8th claim and the Wardias' claim. And the Wardias' claim doesn't require that he submit to the rule or that he, you know, show the chilling effect. The fact that the rules existed is what entitles him to release under Wardias. But as to the 8th claim and the other claims, this unreasonable finding of fact that there was no chilling effect or other harm is belied by the record. Trial counsel is arguing all up and down this appellate record that they cannot move forward with an evaluation because of what the rule exposes Mr. Sears to. Because of the other constitutional rights they would have to trade away. And they say it the morning before they withdraw the motion. They say it previously. They make other motions to try to get around its most onerous application. You know, they make a motion to have him evaluated after the guilt phase so that any, you know, compromise to his rights against self-incrimination might be avoided if he's speaking to the expert after the guilt phase. They say in their appellate brief to the Georgia Supreme Court that Mr. Sears is a man with serious psychological problems and that they need this evaluation. And they say in their brief to the Georgia Supreme Court, you know, state in their place as counsel, this is the reason we withdrew the motion, back in the trial court on the motion for new trial, as the stable rule is reversed. As soon as the rower decision comes down, they go back to the trial court on motion for new trial and say we want our evaluation now. The reason we didn't have it before, as this court knows, is because of the operation of this unconstitutional rule. So the Georgia Supreme Court is looking at a record replete with a killing effect, with trial counsel stating in their place that this is why he didn't move forward with an evaluation despite the need for one. And so they're entering a finding that's clearly and convincingly rebutted by the record that they have in front of them. And even if you believe that there's a fatal deficiency in trial counsel's, you know, preservation of that claim, even if you believe that trial counsel's failure to withdraw the motion, you know, defense motion 11 for the assistance of an expert, if you believe they should have said we are only withdrawing this because we are going to be submitted to this, or we're going to be subject to this rule that requires us to submit all of our results in our experts name and everything else to the state, to the prosecution, if you find that that's what was necessary, well you know, if that's what's required to protect his rights and they know his rights need protecting because they recognize the unconstitutional application of the rule, then they're deficient in failing to preserve the record. If the court doesn't have any further questions about the stable rule or with respect to the procedural history surrounding the stable rule, I will move to discussing the penalty phase prejudice, which we've already touched a bit on, from trial counsel's ineffectiveness in failing to complete a thorough investigation. Okay, as I noted, the Supreme Court found deficiency and the majority of the investigation was quote, facially deficient, and the dissent observed that the lower court had responsibly executed the first step in the Strickland analysis. But on the prejudice prong, the United States Supreme Court also held that in the face of a deficient investigation, the resulting penalty phase strategy could not be deemed reasonable. On identical facts, the Georgia Supreme Court concluded to the contrary. Both prongs of the Georgia Supreme Court Strickland analysis are flatly unreasonable and consequently this court may perform de novo review. So with respect to the prejudice inquiry, it is not simple as the Georgia Supreme Court carried out the task that they were given on remand and reweighed the evidence as directed by the US Supreme Court and found that the balance came out somewhat less than sufficient to the reweighing that we have set forth there in the Georgia Supreme Court's opinion is unreasonable and contrary to federal law and I'm not reasonable application of federal law for some very specific reasons that are obvious in its analysis. And I would like to address a couple of those briefly. One particularly compelling example of this is the court says that this evidence that Mr. Sears was repeatedly sexually abused as young child would carry quote little weight with the jury. And they say it was because it was equivocal and because Mr. Sears' brother had an obvious interest in his case. That finding equivocal is eyewitness testimony to the abuse. Abuse that he himself suffered, Demetrius himself also suffered, and that he witnessed Mr. Sears suffer. And he had made disclosures of that abuse that predated Mr. Sears' arrest on the capital charges. So I don't understand what is equivocal about that evidence. And if you hold this finding that says that evidence would carry quote little weight up against the clearly established federal law that says sexual abuse evidence, even where in Wiggins the only evidence was the self-report from a defendant, Mr. Wiggins, who was a serial liar, the Supreme Court says that is quote powerful mitigation evidence. If you hold those things side by side, the Supreme Court saying that that is powerful mitigation evidence and the Supreme Court evidence saying it would carry little weight with the jury, that's an unreasonable application of federal law. The test is not whether that evidence would have been enough to convict Mr. Sears' cousin of the sexual abuse. The test is just would one or more of these jurors have thought that this was information relevant to his culpability. The U.S. Supreme Court says that it's powerful in that regard and the U.S. Supreme Court also said in this very case that any credibility problems with Mr. Sears' brother Demetrius were not enough to undermine the value of this evidence for mitigation purposes. And yet the Georgia Supreme Court turned around and entered precisely the opposite finding. Another particularly compelling example of the is their primary consideration of the brain damage evidence. And that primary criticism is that there is no reliable proof of the source of the brain damage. In other words, it's etiology. The head injuries and the cocaine use. They say you haven't proven with sufficient reliability that those two things happened, his head injuries and his cocaine use. But the U.S. Supreme Court said in this case that the etiology of the brain damage and the sources the experts relied upon were not enough to undermine the power of the results and objective evaluation. He was tested and that testing measured catastrophic impairment consistent with blows to the front of his head. The client has two scars on the front of his head. His family recalls blows to the front of his head for which they sought medical treatment. So again, it's an unreasonable application of federal law and it defies logic to say that reasonable jurors would shrug off that evidence because Mr. Sears had failed to prove that he suffered any head injuries or failed to prove that he used cocaine regularly. The U.S. Supreme Court said so. It said concerns about the sources the experts relied on, quote, do not undermine the well-credentialed experts assessment based upon between 12 and 16 hours of interviews, testing, and observation that Mr. Sears suffers from substantial cognitive impairment. And by the way, I would add to that that it is not just the cognitive deficits that were measured on objective testing. Dr. Strickland had Mr. Sears complete both a brief symptom inventory and a Beck depression inventory. These are tests that ask the jurors certain statements about themselves and their experiences, and then a score is derived from that inventory, and the results of that for Mr. Sears revealed very elevated scores in anxiety and other disturbances. On those tests, Mr. Sears endorsed statements that, quote, he is so sad or unhappy that he can't stand it, that he's dissatisfied or bored with everything, that he feels he's a complete failure as a person, that he hates himself, that he's lost interest in other people, that he blames himself for his faults, and that he feels irritated all the time. So there are objective tests that also substantiate what Dr. Dudley is seeing about his functioning as a result of his background, and they also, you know, substantiate what's happening when the consequences of his executive functioning deficits, his brain damage, interact with his emotional deficits, his anxiety, his depression, his low self-worth. Those are showing up in objective tests as well as in his history, but the Georgia Supreme Court assesses those expert opinions and defers to the lower court, the Superior Court, finding that that evidence was weak, and even in this concrete testing results. So that, too, is unreasonable, and I would submit that those two conclusions alone, that the sexual abuse evidence and Dr. Strickland's, the idea that Dr. Strickland's findings would not have been impeded to great weight by the jury, are sufficient to remove 2254th bar to relief on the prejudice prong, and they would permit this court to perform de justice. The other place in which the Georgia Supreme Court is particularly unreasonable is in holding up the strength and the virtue of a mitigation case that the U.S. Supreme Court said backfired, you know, that it was easily co-opted by the district attorney. And, you know, the Georgia Supreme Court at the outset lays out a number of mitigating factors that were presented to the jury that are, in fact, compelling, and most of those mitigating factors, you know, that he, that Sears was well-liked, that he had never been in any serious trouble, had no history of violence, that he was polite and well-mannered, that his youth and immaturity and the fact that he was stranded over 400 miles away from home all contributed to his commission of an uncharacteristically violent crime, that he cooperated with the police, that sentencing him to death would devastate his parents, and all of those factors remain except for the notion that Sears came from a background that was, quote, privileged in every way. You know, both the Georgia Supreme Court and respondent here highlight that the mitigation evidence, the evidence in these affidavits as, you know, somewhat benign, as different from the evidence that we're all used to hearing in a capital case of really severe privation, abject neglect. And so I want to talk a little bit about what the mitigation evidence in this case does, even though it is not that evidence. You know, when the U.S. Supreme Court in its Eighth Amendment cases that draw some bright line for eligibility, you know, capital case eligibility, death penalty eligibility in cases like Roper and Atkins, or, you know, juvenile life without Montgomery, they're saying not that something magical happens on everyone's 18th birthday that suddenly makes them possessed of the wherewithal of the judgment and maturity that makes them possessed of a sufficient culpability to be death eligible. What they're saying is that this is the floor, this is the baseline, this is where some individuals reach the point at which they might be possessed of sufficient culpability to be death eligible. And so when at trial, Tom Sharon says to jurors, DeMarcus Sears is a child who was privileged in every way, that DeMarcus Sears had everything we all want for our children, love, safety, encouragement, a comfortable home, a quality education. We had no disabilities, no impairments. What Tom Sharon is saying is DeMarcus Sears is one of the 18-year-olds who's in that category, who's eligible, who's possessed of sufficient culpability. But when you read this affidavit evidence and when you understand, you know, the affidavit evidence, by the way, that is corroborated by records, by contemporaneous records, when you look at that testimony, you come away with just a completely different picture. He's, no, it is not, you know, it's not shocking in the way that being, you know, a child being locked in an excrement-filled dog pen is shocking, but it is heartbreaking. I would encourage the court to read the teacher affidavits. This is a kid who is going home every night to a place, a house that's absolutely loveless, that is pervaded by resentment, where both parents are openly carrying on extramarital affairs, both parents are constantly at each other, sometimes violently, where everybody prefers his older brother over him, where he feels like the bad black sheep, where his father's disappointment in him is palpable, where his older brother is running a drug operation out of the kitchen. That's what this kid is going home to, and that evidence makes the argument that this is a child who was privileged in every way completely unavailable, and that argument is one of the pillars propping up the state's case for death. They need that argument because he's so young, and the crime is so out of character. So in that regard, I think the treatment of the evidence, saying that it wouldn't have been given any weight despite these first-hand accounts from teachers and extended family and classmates, that too is unreasonable, and that too entitles us to a de novo review and to release. Ms. Benton, what do you make of a holdout juror as it relates to prejudice? Prejudice is an objective inquiry, but does that help you at all? Well, Your Honor, I agree. Prejudice under Strickland is an objective inquiry. We're trying to picture reasonable jurors. Presumably, Angel Fisher was a reasonable juror. She was reacting to the strength of the mitigating evidence here. His youth, the other mitigating factors, as the Georgia Supreme Court identified, and he's stranded far from home. He doesn't have any prior history of violence. It's hard not to picture what this penalty phase deliberation would have looked like with the addition of this evidence. How many other jurors might have been convinced to support Angel Fisher's point of view? Or at least, you know, at least what happened would not have happened, that they would not have seen her position as, you know, illegitimate and coerced her into relinquishing her vote. You know, the notion that we have one juror who is so in favor of a life sentence that she held out in the face of this kind of coercion and these kinds of threats over the course of three days is evidence that it's a closed case, right? I understand we're not subjectively dealing with these jurors, but... Counsel, this is Robin Rosenbaum, but just with respect to the juror issue, so I'm sort of turning our attention for a moment to that. I noticed you have broken it into two different claims. One, which is effectively, that I read as, the pressure that the other jurors put on Fisher, and the other being the pressure that trial court instruction put on Fisher, and I wonder if there's any reason why we shouldn't sort of combine those and look at those together. Right, Your Honor, I agree that distinction is artificial. He's entitled to the uncoerced verdict of 12 people. It doesn't matter whether 51% of the coercion comes from the trial court's actions or 51% or more comes from the other jurors' actions. It's the way in which Ms. Fisher saw her circumstances on that Saturday afternoon. You know, what was the reason she finally relinquished her vote? Was it that she had been convinced by the other jurors to change her view of the evidence and of his culpability and of the appropriate sentence, or was she, you know, trying to convince the other jurors to relinquish her vote? And so, you know, it's broken into two separate claims, there's two separate bodies of law, but it's a totality of the circumstances, the evaluation, and the relevant question is Ms. Fisher, and why she relinquished her vote. I know I'm nearing the end of my time, so if I could just briefly turn to the juror coercion claim. The only reasonable reading of that record shows that Angel Fisher was not permitted to cast a sentencing vote consistent with her view of the evidence. The Georgia Supreme Court, by a narrow majority, determined that she changed her mind about the case as the result of, quote, normal deliberations. That finding cannot be reconciled with common sense, with the trial record, with Ms. Fisher's own testimony, or with this court's precedent. As the three dissenting justices observed, here, the trial court did nothing to inform the jury that it should not concern itself with perjury or other extraneous issues, or that a juror's response to voir dire questions was The trial court did make provided little guidance. The explanation of the foreman's duties was open-ended and did nothing to dispel the threat of a perjury prosecution against Fisher, and the trial court's response could not have prevented Fisher from abandoning an honest conviction for reasons other than as based upon the trial or upon the arguments of the other jurors. So, the Georgia Supreme Court's decision that Fisher changed her mind about the appropriate sentence is an unreasonable discrimination of fact that entitled us to de novo review and to release. I see that I am within a minute at the end of my time, so if the court has questions, I would take those now, but otherwise I would reserve my remaining time for rebuttal. All right, hearing no questions, you have reserved then 19 minutes of rebuttal time, and we will hear from Ms. Graham. Good afternoon, this is Sabrina Graham on behalf of the Attorney General's office asking that the court affirm the district court's denial of release. I would like to start with the first claim, the Sable claim, and I think the first question I would like to address before the court is whether or not there is a state court decision, and I think that requires a little analysis of what went on pre-trial and what went on post-trial. Pre-trial, counsel argued, obviously, that they did not want to turn over the names of their experts under Sable, and they did not think that was fair. There were, I think, three, two or three pre-trial hearings about that. At no time did the trial court rule on that. They went into ex parte hearing, and they said, and the trial court asked them, well, what's your evidence of, you know, mental health here, and they said, no, we're going to withdraw that. So they withdrew it. So there is no ruling by the trial court on that particular issue, and when it came time to ask for experts, other experts, an odontologist, and I forget what the other one was, the trial court told them, I won't make you turn over these names until it goes up on interim appeal. When they went up on interim appeal, they did not file a Sable claim. They did not challenge it. After they got done with that, they came back, but they still had pending a motion for psychiatric evaluation after the trial. So this is the record that was before the Georgia Supreme Court that happened pre-trial. Post-trial, at the motion for new trial, is when they came up with evidence. They said, oh, well, he was abused, sexually abused, and he had these other mental health issues, and we would have gotten an evaluation if it hadn't been for Sable. So before the Georgia Supreme Court, they recognized that Sable was in error, and they said, but we can't, based upon the record here, find a killing effect because you withdrew the motion. You didn't give any kind of explanation. I'd also like to point out that they still had pending the motion for psychiatric evaluation for the sentencing phase, which is what this is really about. They wanted that sentencing phase information. I don't think there's any argument here that they were looking for a psychiatric evaluation for the guilt phase. So the question before the court then becomes, was that killing effect? Was that a reasonable decision based upon the record that was there before the trial court? And I would say, absolutely. I mean, that's all they had before. It was no explanation. They had no reason for withdrawing it, and they still had a pending motion out there for psychiatric evaluation. Now, I understand that Petitioner is arguing that their failure to perfect the record is ineffective assistance of counsel, and it also somehow removed that merits decision by the Georgia Supreme Court because it didn't have all the facts that the state habeas court had before it. But going first to the perfection of the record, trial counsel has no need to predict that the law is going to change there. If they have no duty to predict that the law is going to change, they have no duty to perfect the record. This court has long held that you don't have a duty to predict the law. So I think that would be an unreasonable standard to hold them to under Strickland and the Constitution. Moving on to whether or not that state habeas court had to re-decide the claim, because that's what they're arguing, that once they had new evidence, it was required to make another merits ruling. But that's not how it works in state habeas. There is the res judicata bar, which means that if the Georgia Supreme Court has already decided the issue and you come before them with new facts, that doesn't remove that res judicata bar unless you can show that those facts weren't reasonably available. But here in this record, we supported everything there at the motion for a new trial. So I don't understand what, I'm not clear from their arguments what facts weren't available there at the time of trial that they could not have presented, either pre-trial or whenever it was they needed to present it. So I would say that that doesn't remove that res judicata bar. Therefore, according to Ilse versus Nonemaker and Cone v. Bell, you look back at that merits decision. And I understand they're arguing that Cone versus Bell states that where you have new facts, you get to re-decide the case. But in Cone versus Bell, the original state court decision was purely on a state law issue, not a federal law issue. And when the U.S. Supreme Court examined all of that, they realized that, oh, there's never been a merits decision on this by the state court. The first merits decision was on state law, and then all the other state law decisions were procedural bars. So that's why they could get to the merits of that and the new evidence, because they were no longer restricted by ADPA because there wasn't a merits ruling there. So our argument, I think, is that there is a merits ruling on the stable claim by the Georgia Supreme Court. There are certainly reasonable bases for that court to have made that ruling. And I understand the petitioner also argues that the Georgia Supreme Court's decision was contrary to Wardia's. Well, I would point to this court's decision in Welland when they were deciding the same claim, which whether or not the state court's decision on the harmless error was reasonable under Brecht. And in this particular case, is there evidence to support them finding no chilling effect? Yes, there is. Trial counsel didn't explain, and they still had a pending motion for psychiatric evaluation. So there is reasonable support for that. Therefore, it's not an unreasonable application of Supreme Court precedent. Wardia doesn't actually speak to the analysis that you would need to do here. As far as ACI goes, I understand they're saying it's also contrary to ACI, but it is not. ACI says that you have to have, first of all, you have to make a showing there. You have to make a preliminary showing of a significant mental health issue or a serious mental health issue. And that was not made to that trial court. That was not made. So I don't know how you would have an ACI violation without that first showing. And you don't have the trial court precluding them from obtaining a mental health evaluation. You have them withdrawing the motion. So under none of the Supreme Court precedent they're relying upon, do I see that the Georgia Supreme Court made an unreasonable decision regarding the If counsel had continued with their request and not withdrawn the motion, wouldn't the expert have been required to disclose his or her findings to the prosecution? Yeah, I'm not really sure about that, Judge Jordan. Isn't that what Stable says? Well, Stable says you have to turn over the names of them, of this particular expert. But maybe I'm misunderstanding. Are you talking about a written report or not a written report? Are you just saying if they talked to the DA they would have to tell them their findings? Whether it's written or not, I'm assuming that an expert conducts an examination and comes to some conclusions whether they're written down on paper or not. Doesn't Stable require the prosecution to be given that conclusion or set of conclusions? Well, what Stable speaks to, I think what they've used it for is that they could get a written report. But then the trial courts would say, well, you have to give a written report, but they weren't going to require their experts to write a report. And in this particular case, what the trial court said was for the other experts that weren't mental health experts is they had to turn over their names. First it was Judge Brantley and then it was Judge Staley. And neither one of them said they had to turn over a written report. Now, I'm not saying they couldn't have called those experts and asked them what they thought. That's probably. So you can get around Stable by having your expert not write something down on paper? They did do that. I think if you look at the Wellens case, that was a case in which they didn't have their experts write any reports for the DA. So they didn't have to turn it over to the DAs. But in all due candor, the DAs use that at trial to say, well, you didn't write a report. So I don't have anything to use there. OK, thank you. OK, thank you. Unless the court has any other questions regarding Stable or the Stable, Ineffective Assistance of Counsel claim, I'll move on to the prejudice analysis for the Strickland claim. I do actually have another question about the Stable issue. This is Robin Eisenbaum. So am I understanding correctly also that the expert that would have been selected would have been not necessarily of the defendant's choosing? Correct. There was testimony from counsel that part of the reason, and this is from state habeas, this information wasn't before the Georgia Supreme Court. But in state habeas, part of the reason they didn't really want to go after a psychiatric evaluation was because the trial courts would appoint mental health experts from central state, which at that time, generally, the defense bar didn't think were particularly helpful to their clients. OK, so that being the case, why wouldn't the combination of that fact and the fact that you then had to turn over the report, regardless of what it said, not have a chilling effect on the decision as to whether to go forward and have a mental evaluation conducted? Well, I think the fact that who they were going to appoint, that particular information, trial counsel's testimony, was not before the Georgia Supreme Court. So that's information that's not before them. It wasn't an argument that was made before them. So I don't, I'm not sure how you would put that into the analysis. I think the analysis that I'm trying to make here is that what the Georgia Supreme Court... I'm sorry to interrupt again, but is this different from county to county as to how the experts are selected? It could be, yes, Your Honor. Yes, that's... I mean, some counties, I mean, and I think it has to do with where you're located in Georgia. As you know, it's kind of a big state, and I don't think central state covered the entire state. So maybe they could take them there, or if they were in another place, they could hire their own expert. It wasn't, there was no law or statute or rule saying they had to appoint from central state. Some did, some didn't. Did that answer the question? Yes, thank you. Okay. All right. So back to what the Georgia Supreme Court did. Here, the question is, is there any reasonable basis for the Georgia Supreme Court's harmless error determination? And there is. There is a reasonable explanation. Are there explanations on the other side? Of course. That's, I mean, that's what makes these cases so difficult. But as the U.S. Supreme Court just told us yet again this week, if there's a reasonable basis for what that state court did, then even if we would But here, but here, don't we have the Georgia Supreme Court completely doing a 180-degree about-face and rejecting some of the rulings made by the U.S. Supreme Court? Are you talking about for the ineffective assistance? Yes, I thought that's the issue you were talking about. Oh, no, we were talking about the, I thought we were talking about the stable issue. I'm sorry, I apologize. Okay, no, no, then you can hold on until we get there. Okay. Okay, no, we can, I was about to go to ineffective assistance. Yes. So, on the prejudice analysis, which I think is obviously the easiest way to deal with this particular Strickland claim, when you look at what the Georgia Supreme Court did, first, looking at what the U.S. Supreme Court did. The U.S. Supreme Court said, all right, we're going to take what, you know, the state habeas court has done here, and we're just going to assume basically that it's correct. And based upon this, we don't think that the state habeas court did the proper prejudice analysis. I think that saying that the U.S. Supreme Court made fact findings or anything of that nature is really stretching it. And I don't think it's really, I mean, and to say that they have, get to dictate the weight that you give particular evidence without having weighed that evidence in totality of the circumstances seems contrary to Strickland as well, to the extent that my opposing counsel is making that argument. I don't think that, and I'd also like to say that following the Georgia Supreme Court's opinion, it went up on cert to the U.S. Supreme Court on all the issues that petitioner has brought up, and they denied cert on it. So, I think it's, I think what the Georgia Supreme Court did was they looked at the role of the U.S. Supreme Court correctly. I'm sorry. I'm sorry. Go ahead. This is Robin Rosenblatt again. What can we, what, if anything, can we really take from the fact that cert was denied? I mean, my understanding is that denial of cert shouldn't be taken to mean anything one way or the other. Am I mistaken about that? No, I don't think you're mistaken. I'm just bringing it up that, you know, that's a particular procedural point in this history that if it were so, if they really had disregarded what the United States Supreme Court did, seems like they would have talked about that. Seems like they would have granted cert on that and said, hey, you misunderstood everything that we said, especially since half of the, a lot of that opinion is explaining why they are doing what they're doing. But I don't know that it has any sort of precedential weight in this court. No, I agree. Back to what the Georgia Supreme Court did. Again, this is about whether or not the Georgia Supreme Court made a reasonable decision based upon the record before them. There is no Supreme Court precedent that says you must give sexual abuse this much weight no matter what the evidence is underlying it. That's an evidentiary matter. That's not something that the Supreme Court can dictate to the Georgia Supreme Court or to the state courts. And this particular instance, I think that's, you know, Ms. Benton's first argument there was that the Georgia Supreme Court erroneously found that the sexual abuse would carry little weight. Well, first of all, it said carry little weight. It didn't say, the Georgia Supreme Court did not say it carries no weight. It just said a little weight. And when you look at that particular information, you'll see that Steers doesn't even say that he was sexually abused. You had Wiggins saying he was sexually abused, but here you don't have it from Steers. You have his brother saying that they were sexually abused, his brother who can be impeached, and I don't think there's anything inappropriate or unreasonable under Supreme Court precedent for pointing out that his brother could be impeached. That's what a DA would do. And then all of the other information regarding the sexual abuse was hearsay from the brother. Now, I understand, you know, hearsay, it's relaxed in sentencing phase, but it's not completely done away with. I mean, the evidence has to have something reliable under it. And I don't see how that's an unreasonable determination on their part that where you have affidavit one from a convicted felon and the rest just based upon hearsay to say, and this isn't terribly compelling evidence that he was in fact sexually abused, when you don't even have him admitting it to the mental health experts. So again, we're looking at is there any reasonable basis for the Georgia Supreme Court to have found this information carries little weight? Yes, it does. I mean, in the scheme of things, jury's always going to look at that type of evidence and look and see whether or not there's reliable evidence underneath. Let's see, going on to the other issue regarding the mental health determination by his experts and then how the Georgia Supreme Court evaluated that. Well, when you look at what the Georgia Supreme Court did, they at no time said, we're discounting this, we're not going to look at this. They looked at it in depth and they said, okay, well, let's talk about Dr. Strickland, the one who did the neuropsychological testing and said he had brain damage. But Dr. Strickland also said that he had, sorry, my dog is barking outside, I apologize. He also said that the testing wasn't all that he relied upon. He also relied upon the brain injuries, the insults to the brain or to his head and his drug use. So the court said, all right, we got to look at, you know, what supports those things as well, because all of this goes into Dr. Strickland's analysis. And I say, okay, well, we understand that the family has reported in the affidavits that he had, you know, he was hurt, but there aren't any medical records. They don't say they're not, they don't say they're discounting, you're saying it didn't happen, they're just this is what the jury would see. You would see that he had, he had family and friends who say he was hit in the head and then you have, but no medical records to back it up. Okay, regarding the drug and cocaine use. Well, Dr. Strickland said that he used cocaine. The only source that came from was, in fact, Sears. All the other affidavits, they never, no one ever said that they saw him ingest cocaine or smoke the Primos that Dr. Strickland said. So, again, it's not that they're saying that Dr. Strickland was just off left field and making up things, they're saying the information that you're looking at here, Dr. Strickland, doesn't strongly support exactly what you're saying. And going back to the testing, the court looked at Dr. Strickland's testing in depth and they said, okay, on some of these tests he was scoring in a low range, an impaired range, I'm sorry, impaired range, but on most of the tests he was in the average range and he has an average IQ. So, to say that he's one of the most impaired people doesn't really go with your testing either. So, that, I mean, I don't see how there isn't a reasonable basis for all of the decisions that the Georgia Supreme Court was making. It doesn't mean that they're discounting it, they're just trying to figure out how would a jury weigh this evidence because that's their job, they have to weigh it out. And when you look at Dr. Dudley's testimony, which they talk about in detail, they say, okay, he's got these mental health issues, but Dr. Dudley also gave aggravating testimony that he was grandiose and that he was obsessed with his sexual prowess. And when questioned about the actual crime and how his mental health problems affected him regarding the actual rape and murder of Ms. Wilbur, Dr. Dudley couldn't give any kind of explanation because he didn't really talk to Sears about that because Sears didn't, I guess maybe he didn't want to talk to him about it, but you don't have anything there. So, when you put it all together, did Sears have a perfect childhood? No. But if they had put up that his father was abusive or unloving or anything of that nature and they're saying, we're going to take Mr. Sears and we're going to put him on the stand, it's not going to be like the affidavit where you have him lamenting that he wasn't a good enough father. You're going to have a man who's a paralyzed veteran sitting there saying, yeah, I gave my son a home and all the things that he needed, and I tried to teach him the right way to go if he wouldn't go the right way. Counselor, I'm sorry. I think I remember reading in the record somewhere that, for example, the father had a strange kind of disciplinary notion. For example, he burned a fire outside of Sears and his brother's room because he thought they were too noisy and he wanted to smoke them out of there. Is it your position that that would have had no effect whatsoever on the jury's view of this perfect upbringing and this privileged upbringing that the prosecutor explained that Mr. Sears had? Oh, no, that's not what I'm saying. I'm not saying that Mr. Sears' information doesn't have mitigating value. I'm just saying that if you're going to take what they say in total and you're going to vilify his father and his mother and put them up on the stand and make them out to be the worst parents and that he didn't get all the stuff that he needed, I don't know if that's not, in and of itself, somewhat aggravating. Maybe it has some potential mitigating value. Counselor? Yes, sir? Counselor, I hear what you're saying, and, you know, as far as making them out to be the worst parents or anything like that, I don't think that's the point. The point is, and maybe you're absolutely right, it wouldn't really be very relevant except for the fact that the prosecution sort of made it relevant by arguing that, you know, he was from a privileged family, he had every advantage, he had a loving home, a loving family, parents who wanted the best for him, etc., etc. There's, you know, there's nothing, basically, the sort of underwriting there, I guess, is that there's nothing at all that would have in any way contributed to anything he might have done here. And the point of the defense is, you know, that is not an accurate representation of the family life he had, and whether it would have contributed or not, it's certainly not the case, at least from the standpoint of the defendant, that it wouldn't have contributed and the jury should have had the opportunity to assess it. So, in other words, the question is, how does the state's respond to the context in which this is raised, which is the prosecution having argued he had a very privileged lifestyle and he had everything anybody could want and his parents only wanted the best for him, etc., etc. Sure. So, I'm looking at it from the point of view is what the Georgia Supreme Court did. They had to go back and reweigh the evidence. So, if you're looking at a reweigh, then you would have had this other evidence before the jury. And if the prosecutor had still made that argument, then I think that the defense could have said, well, hey, you know, he wasn't that privileged. This does undercut it. But I don't, I mean, I'm not looking at the evidence from the point of view of this is what happened at trial, this is what happened in state habeas, and comparing the two, I'm looking at it how the Georgia Supreme Court looked at it, where he said, all right, we have this information that was presented at trial, and we have all this new information over here, and we're going to reweigh it and determine whether or not it would have created a reasonable probability of a different outcome. So, the fact that the district attorney made that argument there, I don't know that it's that relevant to the Georgia Supreme Court's prejudice analysis after the fact. Maybe I'm wrong, but that's how I see that. And I would go back and also point out, on the affidavit evidence regarding his family, the Georgia Supreme Court did not say it was benign. They did not discount it. They said, okay, let's assume it's all true. When we're looking at U.S. Supreme Court precedent where they have overturned a prejudice analysis by a state court, it has been when they've had a precedent here. Maybe his childhood wasn't, you know, ideal, pleasant. Maybe or maybe not, his parents weren't nice to him sometimes. You know, whatever it is, it still doesn't rise to the horrific level that you have from the particular cases in Williams and Williams and Rompilla, which were clearly established law at that time. So, at that time, the clearly established law did not say that you had to find prejudice when there was any evidence of a difficult childhood. So, again, bringing it back around to was it reasonable for the court to say that, then yes. They looked at all of the evidence, and they certainly evaluated that evidence, and they said, this is what we think, and there's a basis for every single decision that they make in that record. And I don't think that the U.S. Supreme Court meant to dictate to them the way they had to give any particular piece of evidence when they remanded the case back to the state habeas court. And I think it's, you know, exactly what was said. It may be a close case as far as the prejudice analysis goes, but where it's a close case, that means there are arguments on the other side, and that means there's a reasonable basis for what the state court did, and that's what this court is looking at. Unless the court has any other questions regarding ineffective assistance, I'll move on to the juror misconduct claim. Counsel, this is Robin Rosenbaum again. Let me ask you the same question that I asked the opposing counsel, and that is, is there any reason why we shouldn't be considering together the-what are separated out into two claims for the juror coercion issue? That would be the coercion, alleged coercion by the foreperson and the rest of the jurors, and then the other claim, the alleged coercion by the judge's jury instructions. I think coercion is the totality of the circumstances evaluation, but here it still would require first to determine whether or not Juror Fisher was coerced by the other jury members unconstitutionally, and whether or not she was coerced unconstitutionally by the trial court, because the trial court wasn't working in concert with the other jurors. So, I think that's difficult. I'm sorry, I think that's true, but since it is the totality of the circumstances analysis, and it seems like it would be reasonable and common sense that the two different sources of alleged coercion could act together or in concert, even if not intended to do so. I guess I'm asking you, is there any reason why we shouldn't be considering that together? Well, I think, Your Honor, you hit on it there, that they had to intend to work together if you're going to do coercion in that sense. But let me ask you, let me ask you a question. Why is that? Why would they have had to have intended for the coercion to work together? That is, why would the jury and the, what difference does it make whether they intended for their, for any alleged coercion that would have occurred to have worked in tandem with each other or not, if that was the ultimate effect? I'm just not aware of any Supreme Court precedent that states that where you have a juror give it, where you have jurors who are obviously antagonistic towards one another, and you have a judge who gives a couple of Allen charges following the statement of deadlock, that you could take those two things and combine them and create coercion. Can I ask you a question about that? Sure. I'm sorry, I just want to make sure I'm understanding. You would agree, though, that we're looking at the totality of the circumstances, is that right? Yes. Okay. So if we're looking at the totality of the circumstances of what's creating coercion on a juror, and the allegations are that there are two different sources that are creating coercion, why wouldn't we consider them together? I understand you're not aware of a case that says that you should, but are you aware of a case that says that you shouldn't, and what would be, and if not, either way, what would be sort of the logical argument for saying that you shouldn't look at them in tandem? Sure. Well, first of all, I'm looking here at what, I'm sorry, not me personally, but the court's looking at what the Georgia Supreme Court decided on this particular issue, and so that will require that you first look at the, I don't mean, you don't have to, actually, you don't have to do it in any kind of order, but let's look at what the, how the jurors were treating each other. Is there coercion there? And there isn't any Supreme Court precedent that told the Georgia Supreme Court that they had to take how the jurors were acting towards one another and the judge and combine it all together and do their analysis in that manner, so there wouldn't be any clearly established law showing what the Georgia Supreme Court did was unreasonable, but I'd also like to point out that what they did wasn't unreasonable when they said there's normal jury dynamics. Is that an unreasonable finding of fact? Is that an unreasonable determination of law? Not under any clearly established federal law. I'm sorry about that one. Sure. I mean, I'm not aware that it frequently happens, you know, in my experience as a prosecutor and as a judge, as a district judge, and now on the appellate court, I don't recall ever having seen a situation where the other jurors threatened a holdout juror with perjury charges, assuming they even had the authority to find a press, and that they then went so far as to write a note to the court asking the court for transcripts to be able to prove alleged perjury and for instructions about that. I mean, that just seems different to me than the usual juror coercion, and maybe you could explain to me why it's not. Well, sure, and first, I'd also like to point out that when Judge Staley got that note, she specifically told the jury that she wasn't going to read the voir dire back to them and she was not going to charge them on perjury, letting them know they needed to let that particular issue go. So I don't think they were left with the impression that perjury was still on the table. As far as what jurors say to one another, I mean, we don't generally get to that because of the no impeachment rule. I mean, that's what goes on in the jury room. I have no basis for, you know, what other jurors say to other jurors, varied deliberations. Judge Counsel, let me ask you this. Have you ever seen another case where there's a note from the jury to the judge asking the judge if the judge would please provide instructions on a charge that would be, that they would seek to use against the co-juror? I mean, I've never seen anything like that. That just seems extraordinary to me. Yes, but Nancy, you've been through that. No, I've never seen anything like that. But then again, I have to come back to what did Georgia Supreme Court decide that it was normal jury dynamics, that they didn't get along, they were antagonistic on both sides, and they yelled and screamed at each other. Is it unconstitutional for that to have happened? Is there a clearly established Supreme Court precedent that makes that unconstitutional? I don't see any of that. I don't see any Supreme Court precedent that says that. I don't see any Supreme Court precedent that dictates how a jury must or must not deal with one another in that aspect. I mean, it is deliberations they are going to argue. And the US Supreme Court has acknowledged that for 100 years. It's an argument. So I think that brings you then into the realm of dictating to them how they should treat one another. Will we like them to be nice to each other and professional? Absolutely. I mean, but does this rise to the level of unconstitutional coercion because she was difficult and the other side called her on it? I don't think so. I don't think there's any Supreme Court precedent that supports that. Counsel, just to be clear, I don't take any issue whatsoever with your position that, you know, jurors get into it sometimes, and in fact, probably frequently, where there's a lot of discomfort and yelling and screaming in the room. I just see something materially different about a jury that takes into its own hands the notion of seeking to charge another juror with a federal crime. And I guess that's the part that I would like for you to address as to why that doesn't, why that, why it's not unreasonable for the Georgia courts to have found that that was part of normal juror relations. Well, first of all, I mean, it would be nice if we had a definition of normal jury dynamics, which I don't have. But looking at it from the Georgia Supreme Court's point of view, yes, you have the note that goes out, but you also have what else the Angel Fisher, college-educated lady, you know, she stood up for herself for a long time there through those deliberations. And so the fact that they sent out the note, to me, the fact that they sent out the note doesn't show, wouldn't show undue coercion unless the trial court had given a charge on perjury or read that stuff back or given any kind of credence to it. I don't see how it's coercion when... So you are saying that we need to consider the two together, what the court's instructions were with what the jury did. On that, yes, yes, yes. And then if we do it on that, don't we have to do it on both? I don't know how you do it on the other particular issue when you look over at what the trial court charged them with. So there were two notes, there were two deadlocks. After six hours of deliberation, there was nothing coercive about that charge. I mean, and she told them, hey, we're going to break. You guys go and enjoy, you know, each other's company. It was, there was nothing coercive about it. And they come back and they say the next day that they're deadlocked again. Well, that's only two deadlocks. And she says, okay, look, you guys, can we, can you please keep deliberating? Again, nothing coercive there. Then they write those notes and the judge says, you know, I'm not going to give you the charge on perjury and I'm not going to read that stuff. And hey, everybody, let's deliberate. She never tells them what they're going to do. And so I have to look at it from what she did. And none of that was coercive. And even after the charge from the last deadlock, it was still, what, another six hours before they came back with a decision. So looking at what she did, there's just, there's nothing coercive in there. And so I don't see how you would say if there's nothing coercive here, we get to add in what the jurors did over here, especially if they weren't coercive. I'm honestly trying to answer the question and I'm just putting it together in my head. I just don't see how you look at, I just don't see how you take both of those, put them together and then shake it up and say, well, there's all this coercion because the jury thought, you know, the jury was being mean to Ms. Fisher and the court is over here saying, hey, everybody, please just deliberate, try to get along. And, you know, I'm not giving into your threats of perjury. So looking at it all together, I just don't see how the Georgia Supreme Court made an unreasonable decision under clearly established Supreme Court precedent. There just isn't any precedent saying that what she did was coercive, that what the trial court did was coercive, that what the juries did was coercive. And even if you put it together, that that together combined to something coercive, unless you just look at it from one point of view and say, oh, this is all terrible. But if you look at it as the Georgia Supreme Court did, from all the points of view, I think there's a reasonable basis there for what they did. Unless the court has any other questions, I'm happy to be quiet and let Ms. Benton respond. All right. Thank you, counsel. All right. Thank you. Thank you. We will hear again from Ms. Benton. Thank you. I'm grateful that the court has given us some extra time to get through all of these issues, but I suspect that I'm going to be able to yield some of that time back to the court. I just want to briefly make a couple of points about the record and about the evidence that came up during Ms. Graham's argument and take any questions the court may have before briefly concluding. With respect to the idea that the trial counsel could not have made the eggs showing, they have an 18-year-old defendant with a completely out of characteristic crime needs to be explained. They can make the eggs showing, and they testified in their affidavits that they were confident that they could. Under AIC, McWilliams' decision from the Supreme Court says that AIC clearly established that he is entitled to an expert who can perform a certain role, and that role is to assist the defense in building a defense. They can't obtain that expert here. There's nothing that would keep that expert from turning around and sharing every discussion that he or she had with the trial lawyers with the prosecutor. Trial counsel, when they're evaluating this from their perspective at the time, they don't know what we now know. They don't know that his deficits are measurable on objective testing. They don't know that what every expert is going to get the same results. They're worried that an antagonistic expert will see him as perhaps antisocial or have some other unfavorable diagnosis, or just that he's fine, or that Mr. Sears, because of his disinhibition, will make damaging statements to that expert, and that expert will turn around and share 100% of that with the prosecutor and that's stable, stable required, and they knew it. With respect to the AIC for failing to perfect the record, casting this as a failure to predict the change in the law isn't remotely consistent with the record here. Trial counsel knew their client's rights were being violated. They stated that over and over and over again. Their testimony is, I didn't perfect the record because I just didn't see this coming. I didn't know I needed to preserve his rights under Rohwer. Their testimony is, we neglected to do something that we needed to do, and it turns out that that was fatal to his claim on appeal. That's their testimony. If you take Ms. Graham and her word that they were not required to put on the record at the time they withdrew the motion, why they were doing it, because they weren't required to see Rohwer coming, well, then the Georgia Supreme Court, who can direct the deal, held them to an unfair standard by saying that the fact they didn't put it on the record was fatal to the claim. All roads here lead to relief, and it doesn't matter if it's the ineffectiveness isn't fulfilling to correct the record, or it's the claim as presented during his behavior proceedings, or it's the claim as presented on direct appeal, he didn't get the expert he was entitled to, and the most relevant evidence about his culpability did not get to this jury. All 18-year-olds have more judgment, more ability to control their impulses, more ability to figure things out and problem solve than this kid has. Just very quickly with respect to the Penelope's prejudice, there was much made of the fact that there are no medical records, but trial counsel didn't seek a single record, so we don't know what medical records might have been available in the early 1990s that were not available some 10 or 15 years later when post-conviction counsel investigated. There is testimony that medical treatment was sought for these head injuries, and the client has scars, so it may well be that there were medical records available in 1991. As to the idea that really abject privation and a horrifying childhood is the standard for finding prejudice in a capital case, if that's true, if that's the only kind of evidence that can merit a Strickland prejudice finding or even merit a serious weighing of prejudice, if that is true, why on earth would the U.S. Supreme Court expend its scarce resources to grant certiorari in this case? That makes no sense. There is compelling mitigating evidence of brain damage that bears directly on his culpability, and trial counsel's inadequate investigation led to a And that is what in reasonable probability led to the outcome here. If I could just briefly talk about the juror coercion, there is Supreme Court precedent on this, and the Supreme Court precedent says that a juror's vote can't be coerced. That is not a difficult standard to apply here. It was not just that Angel Fisher is subject to words from the jurors or even mistreatment from the other jurors. Yes, they're cussing at her. Yes, they're ostracizing her. Yes, they're calling her names, but they have also questioned her role as a schoolteacher. They have threatened to have her charged with perjury. She is a young African-American woman on a jury in Cobb County in 1993 with nine men, most of them older white men, who have now threatened to upend her life. Her experience, based on her college education, her wherewithal, her experience is that they can do what they say they can do, and Judge Daley does not put a stop to it. It wasn't just twice that they declared a deadlock, like respondent said. It was three times over the course of two days that she reaffirmed her life sentence vote to this trial court. The other jurors are saying the deadlock is hopeless with no hope of resolution. Angel Fisher knows the trial court knows she's the one with the life sentence vote. How else is she supposed to regard that third time being sent back on Saturday morning after all that has happened? By Saturday afternoon, there's no other way out for her other than to change her vote, not her mind, her vote. So, from start to finish, Mr. Sears' trial was infected with constitutional error and... Counsel, I'm sorry to interrupt. This is Cheryl Rosenbaum. The state says that this is just normal juror coercion. It goes on in most cases. So, what is their... Why... Obviously, you think this is an unreasonable finding by the Georgia courts. Why do you think that... What makes this finding unreasonable by the Georgia courts, in your view, that it's not just normal, regular juror coercion that we see in every case? Well, the threat for one thing and then the trial court's handling of those threats for another. You know, it's not one piece here. If they had called her names or tangled with her or questioned her judgment or... You know, that's not what happened here. And maybe that does happen. It's not what we want to happen. But whether that is over the line from pressure to coercion, I don't know, and you don't need to decide. What happened here was they threatened to upend her life. They threatened to have her said, oh, you're a school teacher? You're near our children? And for hours, hours on end, to the extent that she later had health problems, which the court would not let her testify about. She lost sleep and she said she was frightened. That's duress. That's duress in every area of the law. That's not someone who can now exercise their free will to cast a vote consistent with conscientious scruples. And that's the standard. The state's case for Dexter was billed atop three pillars, each of which was inaccurate or misleading because the jury was deprived of the most relevant evidence on that point. First, there was the notion that Mr. Sears was a child privileged in every way, that he had all the benefits of a loving home and was a typical teenager unencumbered by any disability. Had trial counsel conducted a constitutionally adequate investigation, the jury would have heard this was far from true. In addition, but for the application of an unconstitutional discovery rule and counsel's ineffective assistance, the jury would have learned that nearly all of Mr. Sears' same age peers are possessed with greater judgment, impulse control, and the ability to tune out distracting stimuli. The second pillar of the state's case, that Mr. Sears and not Mr. Williams set in motion and carried out the kidnapping, also begins to crumble had the jurors learned that Williams planned and carried out a similar attack just three months later at the Cobb County Jail. And the final pillar of the state's case, that Mr. Sears was the worst inmate in the Cobb County Jail and would be an ongoing dangerous sentence to life in prison, that third pillar likewise crumbles with the addition of the Brady evidence regarding Williams' attack and with the addition of the evidence of Mr. Sears' brain damage, which explains his deficit in impulse control. Even in the face of this misleading picture of Mr. Sears' culpability, one juror concluded that a life sentence was the appropriate verdict and she relinquished her vote only as a result of coercion and distress. I'm sorry. Had an accurate picture emerged, one that included not only Sears' youth, his good nature of personality, and the influence that Williams had over him, but also included his profound brain damage, his difficulty managing his emotional state, and his troubled home life, there is far more than a reasonable probability that the other jurors would have come to support Ms. Fisher's position that life was the only appropriate verdict. The state court decisions with respect to these claims were unreasonable and cannot bought relief and so we would ask that this court reverse the decision of the district court and vacate Mr. Sears' convictions and death sentence. If the court has no further questions, I'll yield the remainder of my time back to the court. Thank you, counsel. Any further questions? All right, hearing none, thank you both very much. I think the oral argument has been very helpful and we will be in recess. Thank you, Your Honor.